C. Jason Carter, Deputy City Attorney City of North Little Rock 300 Main Street Post Office Box 5757 North Little Rock, AR 72119
Dear Mr. Carter:
You have requested approval, pursuant to the Interlocal Cooperation Act, A.C.A. § 25-20-101 et seq., of a document captioned "Unit Power Purchase Agreement" (the "Agreement"), between the City of North Little Rock and the Missouri Joint Municipal Electric Utility Commission (the "MJMEUC"). You indicate in your request that the cities of Osceola and Piggott are considering entering into materially identical agreements.
RESPONSE
For the reasons set forth below, I hereby declare that the Agreement complies with the provisions of the Interlocal Cooperation Act.
The Agreement represents that "MJMEUC was formed for the purpose of procuring electric energy and capacity for the benefit of, and pursuant to the governance and direction of, MJMEUC's members." The Agreement characterizes the City of North Little Rock as "a[n advisory] member of MJMEUC."[1]
The Agreement recites the following factual background:
 MJMUEC is engaged in negotiations to acquire an undivided ownership interest in the Plum Point Energy Station ("PPES"), a single-unit, coal-fueled generating station with an anticipated net capacity of approximately 650 MW, which is under development by Plum Point Energy Associates, LLC ("PPEA") near Osceola, Arkansas[.]
The Agreement further represents that "PPES is expected to enter commercial operation in 2010 and to have a useful service life of at least 40 years[.]" The Agreement further provides as follows:
 WHEREAS, City desires to enter into an agreement for a long-term, cost-based purchase from MJMEUC of capacity and energy to be provided from MJMEUC's PPES ownership interest, and MJMEUC desires to make such a sale to CITY, all pursuant to the terms and conditions set forth herein;
 WHEREAS, in exchange for the opportunity to make purchases hereunder on terms that provide benefits similar to those of ownership of PPES, City agrees to equitably share, pursuant to the terms and conditions set forth herein, in the development and other risks (including certain up-front costs) that MJMEUC must bear in connection with its efforts to obtain an ownership stake in PPES; and
 WHEREAS, MJMEUC will rely on the commitment entered into by CITY herein in going forward with MJMEUC's efforts to obtain and finance a share of PPES.
 NOW, THEREFORE, in consideration of the premises, the mutual promises and agreements set forth herein and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the PARTIES do hereby agree as follows:. . . .
The ensuing provisions of the Agreement, although complicated, are in all respects consistent with these preliminary representations. The Agreement does not simply provide for the sale of energy by MJMEUC to North Little Rock at a recited rate. Rather, it provides for North Little Rock to become a member of MJMEUC, along with other municipalities, and, as such, to participate actively in an advisory and financial capacity in MJMEUC's efforts to obtain an ownership interest in PPES. The Agreement contemplates a joint undertaking pursuant to which the parties will cooperate in MJMEUC's efforts to obtain a minority ownership interest in PPES, presumably subject to the expectation that North Little Rock will realize energy savings under the rate formulas set forth in the Agreement once PPES becomes operational in 2010. The goal, as stated in the recited excerpts from the Agreement, is for North Little Rock to "equitably share . . . in the development and other risks" of MJMEUC's efforts to obtain an ownership interest in PPES, which is still in the process of building a generating plant in Osceola, Arkansas, in the expectation that North Little Rock will eventually realize "benefits similar to those of ownership of PPES." You are seeking my approval of this proposed agreement pursuant to A.C.A. §25-20-104(f), which provides that I must approve any interlocal agreement to undertake a joint enterprise between or among "public agencies."
As an initial matter, I must determine whether both parties to the proposed agreement indeed qualify as "public agencies" — a term the Arkansas Code defines in pertinent part as follows:
 "Public agency" means . . . any political subdivision of this state . . . [and] any political subdivision of another state. . . .
Specifically with respect to agreements between or among entities located in different states, A.C.A. § 25-20-104 provides that an Arkansas public agency may enter into a joint enterprise with "any public agency of any other state of the United States which has the same powers, privileges, or authority, but only to the extent that laws of the other state or of the United States permit the joint exercise or enjoyment."
It is beyond dispute that North Little Rock is a "political subdivision" of the state. However, it is not facially apparent that the MJMEUC, which is an entity distinct from the cities that comprise its membership, would qualify as a "political subdivision." The legislature has defined the term in various ways, depending on the context of particular legislation. See,e.g., A.C.A. §§ 12-9-102(3) and 12-9-401(7) ("`Political subdivision' means any county, municipality, township, or other specific local unit of general government."); A.C.A. §12-50-103(8) ("`Political subdivision' means a city of any class, a town, or a county."); A.C.A. § 14-77-102(f)(4) ("`Political subdivision of the state' means any county, municipality, school, quasi-public organization, district, any official, office, employee, or any agency, instrumentality, or function thereof."); A.C.A. § 15-6-103(8) ("`Political subdivision' means a county, municipality, and any other unit of local government, including a school district and an improvement district, authorized by law to perform governmental functions."); A.C.A. § 19-7-901(2) ("`Political subdivision' means any agency or unit of this state which is authorized to levy taxes or empowered to cause taxes to be levied."). In two instances, the term has been defined as including only public corporations: A.C.A. § 21-1-303(4) ("`Political subdivision' includes counties, cities, towns, villages, townships, districts, authorities, and other public corporations and entities whether organized and existing under charter or general law."); and A.C.A. § 15-5-103(18) ("`Political subdivision means a city of the first class, a city of the second class, an incorporated town, a county, or an improvement district, or any agency, board, commission, public corporation, or instrumentality of the above."). In addition, the Arkansas Supreme Court has adopted the following general definition of the term "political subdivision":
 [P]olitical subdivisions have been defined as that they embrace a certain territory and its inhabitants, organized for the public advantage, and not in the interest of particular individuals or classes; that their chief design is the exercise of governmental functions; and that to the electors residing within each is, to some extent, committed the power of local government, to be wielded either mediately or immediately within their territory for the peculiar benefit of the people there residing.
Dermott Special School District v. Johnson, 343 Ark. 90, 95,32 S.W.3d 477 (2000), quoting Muse v. Prescott School Dist.,233 Ark. 789, 791, 349 S.W.2d 329 (1961), in turn quoting ArkansasHighway Commission v. Clayton, 226 Ark. 712, 715, 292 S.W.2d 77
(1956) in turn quoting Allison v. Corker, 67 N.J.L. 596,52 A. 362 (1902).
In Ark. Op. Att'y Gen. No. 2001-363, one of my predecessors concluded that a housing authority would in all likelihood fall within the just recited definition of "political subdivision." As reflected in the following from Ark. Op. Att'y Gen. No. 99-277, various "authorities," including a "development authority," have been designated "public bodies," and hence "units of government," under Arkansas law:
 The term "public body" has been consistently applied in the Code to entities that appear clearly to qualify as "units of government." For instance, A.C.A. § 17-33-101 defines the term as "any agency of the State of Arkansas or any political subdivision of the state." Similarly, A.C.A. § 22-9-302 defines the term as "the State of Arkansas or any officer, board, or commission of the state, any county, city, municipality or other political subdivision, or any of the agencies thereof." A.C.A. § 14-188-103 defines the term "state public body" as meaning "any city, town, county, municipal corporation, commission, district, authority, or other political subdivision of this state." A.C.A. § 14-169-203 defines the phrase" state public body" as meaning "any city, town, county, municipal corporation, commission, district, authority, other subdivision, or other public body of the state."
 In accordance with such definitions, the Code has expressly identified as "public bodies" such entities as a housing authority, A.C.A. § 14-169-211, a rural development authority, A.C.A. § 14-188-109, the Arkansas Development Finance Authority, A.C.A. § 15-5-201, and the State Highway Commission, A.C.A. § 23-12-304. These organizations all might be considered "units of government" insofar as they not only implement but make public policy.
Perhaps the most that can be gleaned from the foregoing definitions is that the precise meaning of the term "political subdivision" can vary with the context of the legislation in which it appears.
Before discussing the context within which this term is used in the Interlocal Cooperation Act, I will briefly review the nature of MJMEUC as authorized under Missouri law. The Agreement characterizes MJMEUC as being "a body public and corporate of the State of Missouri" and "a joint municipal utility commission formed and operated in accordance with Sections 393.700 to 393.770 of the Revised Statutes of the state of Missouri." The authority for the formation of the MJMEUC is found at Mo. Rev. Stat. § 393.710, which provides in pertinent part:
 1. Municipalities, public water supply districts, and sewer districts may, by joint contract, establish a governmental entity to be known as a joint municipal utility commission, to effect the joint development of a project or projects in whole or in part for the benefit of the inhabitants of such municipalities, public water supply districts and sewer districts.
Section 393.720 of the Missouri Revised Statutes further provides:
 Any commission established by joint contract under sections 393.700 to 393.770 shall constitute a body public and corporate of the state, exercising public powers for the benefit of its contracting members and in order to carry out the public purposes and the public functions of its contracting members. It shall have the duties, privileges, immunities, rights, liabilities and disabilities of its contracting members and as a public body politic and corporate but shall not have taxing power separate from that of its members nor shall it have the benefit of the doctrine of sovereign immunity.
I find it significant that MJMEUC was formed under Missouri statutory law as what the Agreement acknowledges is "a body public and corporate" — a designation consistent with classification as a "political subdivision" under at least some of the definitions of that term under Arkansas law recited above. As the above recited Missouri statutory provisions suggest, the purpose of an organization like MJMEUC is the performance of an essentially governmental power, see A.C.A. § 14-54-701
(authorizing municipal corporations to provide power to their residents), thus qualifying MJMEUC to enter into an interlocal agreement under Arkansas law. Compare Ark. Ops. Att'y Gen. Nos.2002-345 (approving a proposed interlocal agreement between the Stilwell Area Development Authority, Stilwell, Oklahoma, and Independence County, Arkansas, pursuant to which the Authority would agree to buy electricity produced at various yet-to-be constructed facilities owned by the county); 2000-187 (concluding that the Central Arkansas Transit Authority might properly enter into an interlocal agreement with the City of Little Rock and the City of North Little Rock to renovate, operate and maintain the Main Street Bridge across the Arkansas River).
Having concluded that the parties are entities of the sort that might enter into an interlocal agreement, I must next determine whether the proposed agreement in fact involves a joint undertaking of the sort that requires my approval, as opposed to a straightforward purchase contract of the sort the parties might enter into without my approval. See A.C.A. § 25-20-108. Notwithstanding the fact that Section 16.12 of the Agreement, for unexplained reasons, disclaims "[a]ny intention to create a joint venture or partnership relation between or among the Parties," I believe the Agreement nevertheless involves a joint undertaking that qualifies as an "interlocal agreement" as that term is defined under Arkansas law.
In this regard, Mo. Rev. Stat. § 393.770 provides:
 1. The contracting municipalities may provide in the joint contract for payment to the commission of funds for commodities to be procured and services to be rendered by the commission. The contracting municipalities, participating municipalities, and other persons may enter into purchase agreements with the commission for the purchase, sale, exchange or transmission of water, sewage service, gas, heat or any right to capacity or interest in such electric power and energy and any other services provided by the project whereby the purchaser is obligated to make payments in amounts which shall be sufficient to enable the commission to meet its expenses, interest and principal payments, whether at maturity or upon sinking fund redemption, for its bonds, reasonable reserves for debt service, operation and maintenance and renewals and replacements and the requirements of any rate covenant with respect to debt service coverage contained in any resolution, trust indenture or other security instrument. Purchase agreements may contain such other terms and conditions as the commission and the purchasers may determine, including provisions whereby the purchaser is obligated to pay for water, sewage service, gas, heat, power, or any other services provided by the project irrespective of whether water, sewage service, gas, heat, energy, or any other service is produced or delivered to the purchaser or whether any project contemplated by any such agreement is completed, operable or operating, and notwithstanding suspension, interruption, interference, reduction or curtailment of the output of such project. Such agreements may be for a term covering the life of a project or for any other term, or for an indefinite period. The joint contract or a purchase agreement may provide that if one or more of the purchasers default in the payment of its obligations under any such purchase agreement, the remaining purchasers which also have such agreements shall be required to accept and pay for and shall be entitled proportionately to use or otherwise dispose of the water, sewage service, gas, heat, energy, or other service to be purchased by the defaulting purchaser.
 2. The obligations of a contracting or participating municipality under a purchase agreement with a commission or arising out of the default by any other purchaser with respect to such an agreement shall not be construed to constitute debt of the contracting or participating municipality. To the extent provided in the purchase agreement, such obligations shall constitute special obligations of the contracting or participating municipality, payable solely from the revenues and other moneys derived by the contracting or participating municipality from its municipal utility and shall be treated as expenses of operating a municipal utility.
The Agreement is in all respects consistent with the provisions recited in this statute.
Notwithstanding its use of the term "purchase agreements," this statute clearly contemplates a relationship between the parties that differs from that of a seller and buyer. The statutory provision obligating the "buyer" to pay for power irrespective of whether the power is supplied reflects the fact that the contractual relationship is in the nature of a joint venture, pursuant to which the "purchaser" is in effect investing in the "seller," ensuring an income stream sufficient to service the debt incurred in financing the facility that will provide energy to the municipal participants. Significantly, the Agreement provides for the City of North Little Rock's advisory membership in MJMEUC and payments by North Little Rock to MJMEUC for years before PPES is even operational. In my opinion, this arrangement is clearly not a simple purchase agreement but rather a joint undertaking of the sort that qualifies as an interlocal agreement requiring my approval pursuant to A.C.A. § 25-20-104(f).
The Interlocal Cooperation Act requires that interlocal agreements for joint or cooperative action specify the following items:
(1) The duration of the agreement;
(2) The purposes of the agreement;
 (3) The manner of financing the joint or cooperative undertaking and of establishing and maintaining a budget for it;
 (4) The methods of accomplishing termination of the agreement and for the disposal of property, if any, upon termination;
(5) Any other necessary and proper matters.
A.C.A. § 25-20-104(c).
In addition, if the interlocal agreement does not establish a separate legal entity to conduct the joint or cooperative undertaking, it must specify the following items:
 (1) The provision for an administrator or a joint board that will be responsible for administering the joint or cooperative undertaking;
 (2) The manner of acquiring, holding, and disposing of real and personal property, if any, used in the joint or cooperative undertaking.
A.C.A. § 25-20-104(d).
Although I am neither authorized nor situated to address the advisability of the Agreement, I conclude that it complies with the Interlocal Cooperation Act.
Finally, I should note that in approving the proposed agreement, I am taking no position on the following issues: (1) whether the PPES is properly licensed by the Federal Energy Regulatory Commission ("FERC") to operate the facilities; and (2) whether the proposed agreement complies with the FERC license and/or federal or state law regulating the sale of electricity. I am further offering no opinion regarding the authority of MJMEUC to enter into the Agreement under the provisions of Missouri law.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB/JHD:cyh
[1] I am unaware of the significance of the brackets in the quoted material. The Agreement appears to be a model to be used in contracting with the other prospective participants. The name of the city in the Agreement has been left blank. The North Little Rock City Attorney's Office has informed me that the City of North Little Rock will be the designated party in the final draft and that the terms contained in this preliminary draft will not change.